# CRIMINAL COURT OF BALTIMORE CITY.

Filed December 1, 1902.

STATE
VS. .
MORRIS LEGUM.

SUPPLEMENTARY OPINION.

RITCHIE, J.—

Among other objections stated in the opinion heretofore filed to the validity of the Act of 1902, was the fact that it failed to provide any sanitary rules, or standard of conditions, by which the Chief of the Bureau was to be guided and controlled in the matter of granting permits to the people who do the work in question at their homes,' but left the determination of what would constitute proper sanitary conditions absolutely to the chief.

Since filing my opinion I have been asked, on behalf of the State, if the preceding sections of the sub-title of the Article, under which this Act has been placed, did not furnish the necessary rules or standard. I fully considered this question before ruling on the demurrer to the indictment, and concluded that they did not. As the State, however, made no such point at the hearing, but, on the contrary, conceded the arbitrary power of the chief and endeavored to sustain it, I did not allude to this question in my opinion. I will state my views on it now.

Of course, all laws relating to the same subject-matter must be construed together, but it is not true that every section in the same Article, or under the same sub-title, always relates to the same subject-matter. Legislation on the same subject-matter is frequently found in different Articles of the Code, while there are many instances in which sections relating to different subjects are placed in the same Article, and under the same sub-title. In construing any given section, or in deciding whether it relates to the same subject-matter as does some other, "very little reliance can be placed upon the heading under which it may be found."

State vs. Popp, 45 Md. 432-7.

The subject-matter of Sections 148 and 149 in the Code of 1888, is the sanitary regulation of all factories, manufacturing establishments and workshops in the State, of whatever description they may be. The subject-matter of the Act of 1902 is the sanitary regulation of the manufacture of certain articles, consisting chiefly of wearing apparel, in the homes of the people who make them.

There is nothing in the Act of 1902 to show, nor is it reasonable to suppose, that the legislature intended that the regulations prescribed for the factories, manufacturing establishments and workshops of the State, of every kind and description, should apply to the manufacture of the articles in question in the homes of the workers. The conditions of the home and the factory are altogether different, and the articles of manufacture in one case are chiefly wearing apparel, while in the other they include all the various products of all the different kinds of factories and workshops in the State.

The Acts of 1894 and 1896 add four additional sections, 149 A, B, C and D. Sec. 149D simply provides that the informer shall have one-half of any fine imposed, and requires no further notice. It is difficult to understand just what Sections 149A and 149B mean, but, passing this by, and looking at all that is necessary for the question now considered, they provide that no "individual or body corporate engaged in the manufacture or sale of clothing," shall cause or permit any garments to be manufactured or made up "in a place or under circumstances involving danger to the public health." The only purpose of Section 149C is to define the meaning of the words just quoted, and it provides that any room or apartment in which certain hereinafter mentioned conditions exist, "shall be deemed a place involving danger to

public health, as mentioned in the next two preceding sections."

There is no reference in the Act of 1902 to Section 149C, nor is there a word to indicate that it furnishes the sanitary rules or standard, on compliance with which the issue of the permit depends; on the contrary, the requirements of Section 149C manifestly relate to the prosecution of the work, rather than to conditions intended to control the issue of the permit, and, besides, the section by its own terms is confined in its application to the two preceding sections. The Chief of the Bureau might under the Act of 1902 look to Section 149C, or to any other source of information, for sanitary suggestions, but he is not required to do so; and, if he does do so, he is bound by, or confined to, the sanitary requirements therein set forth for the special purpose therein mentioned.

But let us suppose that Section 149C and the Act of 1902 are to be construed together, and that this section supplies the necessary sanitary rules or standard. What then? In the first place, if it does, then the chief in granting his permit is confined to the requirements of the section, and cannot require anything more. If he has a statutory standard he must keep to it. If the conditions prescribed by the statute exist when his inspection is made, he is bound to issue his permit, no matter what, in other respects, may be the sanitary conditions of the room or apartment.

In the next place, what sanitary rules or standard of conditions do we find in Section 149C, as applicable to the inspection *and as a basis for the permit?* It being necessary that certain sanitary conditions should exist in and about the room or apartment, what would we naturally expect to find in the standard? It would at once occur to any one, even though not an expert, that the sanitary requirements would relate to the cubic feet of space for each person working therein, to the light, the ventilation, the means of heating, the relation to the working room to the eating and sleeping rooms, its proximity to and the condition of the plumbing, and so forth, just as such requirements are fully set out in the Statutes of Ohio and Wisconsin, and just as the sanitary rules relating to another subject are fully prescribed in

the Act which was passed on in Broadbelt's case, 89 Md. 565, already cited.

Under Section 149C, however, the only requirement suitable as a basis for the permit (unless the room or apartment has been condemned by the Health Officers, or there should by chance be a case of disease), is the one relating to the cubic feet of space for each person working in the room. There is nothing whatever in this section that relates to any other of the sanitary factors just referred to. The other requirements of the section relate to the range of the winter thermometer, the possible occurrence of some dangerous disease, and the daily removal of rubbish. While the failure to observe the requirements as to these things might well be made a cause for revoking the permit, such failure, from the nature of the requirements, could occur, if at all, only in the prosecution of the work after the permit had been granted.

If, then, the Section 149C provides the sanitary standard or rules that are to control the issue of the permit, it is manifest that, unless the premises happen to have been condemned by the health authorities, or there should chance to be a case of dangerous disease just when the inspection was made, the only inquiry the chief can make is as to the cubic feet of space for each person so working. If the required space is found he must issue the permit.

The result of the construction now suggested therefore is, that, in providing sanitary regulation for the manufacture in general of the articles in question in tenement and dwelling houses, or, on the theory of the State, in legislating for the correction of the evils of the sweat shop, the only requirement made by the legislature for the grant of the permit, is that there shall be a certain measure of space for each person working therein. If this is what the legislature intended, it would have been a simple thing to make it plain by referring to Section 149C, but nothing except the insertion in the Act of 1902 of an express reference to this effect, could make me think that such and nothing more was the intention of the legislature. It is far more reasonable to suppose that the legislature, without considering how far it had the power to do so, intended

to leave the entire question of proper sanitary conditions to the determination of the Chief of the Bureau, without prescribing any rules or standard for his guidance or control in granting permits. This, in my judgment, is what this Act does. See further on this point Schaezlein vs. Cabannis, 135 Cal. 466 (67 Pac. R. 755).

As I have had occasion in discussing this question to refer again to the theory of the State, that the purpose of this Act is to reach the sweat shops only, I may add that it is a matter of public information that the Industrial Bureau has made no pretence of confining its enforcement of this Act to the sweat shops, and the indictment in this case does not charge the traverser with maintaining, or being in any way connected with, what is generally understood to be a sweat shop, or with doing anything prohibited by the Act of 1902 under sanitary conditions.